any term for the above sum, with costs of suit, attorney's commission of —— per cent., and release of all errors, hereby waiving inquisition, and agreeing to condemnation of any property that may be levied upon by any execution which may issue forthwith, on failure to comply with the conditions hereof, without stay of execution; also hereby waiving the benefit of any exemption laws, or stay laws, or any act of assembly relative to execution now in force, or hereafter to be passed. [Saml. Walker.

["(Endorsed)—For value received I do hereby assign the within to the First National Bank of Butler, Pa., and guarantee the payment of the same at maturity, waiving protest and notice of protest.

["Alex. Mitchell."] 2

A. N. Sutton and W. S. Purviance, for the rule.

Miller, McBride, and C. McCandless, contra.

McKENNAN, Circuit Judge, in delivering the opinion of the court, said: Under the Pennsylvania decisions the instrument in suit is a non-negotiable promissory note. Such instruments are not assignable at common law and hence are suable only in the name of the original payee. The state statute of May 28, 1715, provides for the "assignment of bonds, specialties, and notes in writing," and that the assignee thereof may maintain suit in his own name. Under the first section of the act any form expressive of the intent of the assignor to vest the ownership of the instrument in the assignee would effectuate its intent, but the eighth section requires a seal and attestation by two witnesses of "bonds and specialties," while the assignment of "notes in writing" is not restricted by any prescribed formula. The note here was duly assigned so as to enable the First National Bank to bring suit in its own name. Can such suit be maintained in this court, both parties being citizens of Pennsylvania? Under the judiciary act of 1789 [1 Stat. 73], it is clear it could not [both because the legal parties are not citizens of different states, and because the assignor of the note in suit could not maintain it on account of his residence in this district.] 3 But the national currency act seems to have abrogated the conditions of that act so far as they may affect national banks organized under the currency act. That act (section 57) gives to the circuit courts original jurisdiction "of all suits by or against any banking association established in the district for which the court is held under any law providing for national banking associations." This is reënacted by Rev. St. 2. 7. The enactment was not necessary to confer jurisdiction upon the circuit courts of suits by and against banking associations, because as separate bodies they might sue and be sued in such courts under the judiciary act

when the conditions prescribed by that act existed. That was manifestly not its object. But it is an unconditional grant of jurisdiction of all suits by or against national banks to the circuit court of the district in which such banks are established, and is limited to these courts. Hence the more reasonable hypothesis is that it was intended to enable national banks to sue and be sued in the circuit courts of their several districts alone, irrespective of the conditions as to the amount in controversy and the citizenships of the parties which are imposed upon the right by the judiciary act. So it has been held in several cases where suits were instituted by national banks as indorsees of commercial paper. The note in this case is not negotiable, but although in most of their characteristic qualities the instruments are unlike, and the legal effect of their transfer is in some respect different, yet what reason is there for a discriminating application of the statutory provision, where the right to sue in his own name by an assignee or indorsee is just as full and complete in the one case as in the other. The terms of the statute embrace all suits alike, and their fair import is that of all suits which a national bank may rightfully institute in its own name the circuit court of the district in which it is established may entertain jurisdiction. Motion to set aside denied, and leave given plaintiff to amend by striking out the name of "Alexander Mitchell, for use," [so that the First National Bank shall stand as the legal plaintiff on the record.] 3

---

## Case No. 9,671.

### MITCHELL v. WILSON.

[3 Cranch, C. C. 92.] 1

Circuit Court, District of Columbia. May, 1827.

REPLEVIN—NO APPEARANCE—EXCUSE—NEGLECT OF DEFENDANT'S COUNSEL—DISCONTINUANCE.

1. If the defendant in replevin does not appear at the return of the writ, and the plaintiff takes no step to obtain an appearance at that term, the cause is discontinued, and the clerk will not bring it forward upon the docket of the next term, and the court will not reinstate the cause at the subsequent term, although the defendant's attorney make affidavit that he was employed by the defendant to appear for him at the preceding term, and promised and intended so to do, and thought he had done so, but finds his appearance was not entered, and presumes it was because he had forgotten to give the order to the clerk; and although the defendant make oath that, before the sitting of the last court he went to the clerk's office, and informed one of the clerks that he should defend the said suit, and that Mr. Key was his attorney.

2. After the discontinuance of the replevin, the goods are no longer in the custody of the law, and the defendant is not guilty of a contempt in taking possession of them.

Replevin for a negro woman named Mahala.

The defendant [William Wilson] did not ap-

---

2 [From 36 Leg. Int. 158.]
3 [From 36 Leg. Int. 74.]

3 [From 36 Leg. Int. 74.]
1 [Reported by Hon. William Cranch, Chief Judge.]

pear at the last term (to which term the writ was returnable), and the plaintiff [Thomas L. Mitchell] took no step to obtain an appearance; no continuance was entered or ordered, and the clerk did not bring the cause forward upon the docket of this term, considering it as discontinued; and of that opinion was THE COURT (THRUSTON, Circuit Judge, absent). It did not appear to be the misprision of the clerk. The court had decided the point in some previous cases.

Mr. Key moved the court to reinstate the cause and to order it to be brought forward upon the docket of the present term, and made affidavit that he was employed by the defendant to appear for him in the suit, at the last term, and promised, and intended to do so, and thought he had done so, but finds that his appearance was not entered; and presumes it arose from his forgetting to give the order to the clerk. The defendant Wilson also made affidavit that before the sitting of the last court, he went to the clerk's office and informed one of the clerks that he should defend the said suit and that Mr. Key was his attorney.

But THE COURT (THRUSTON, Circuit Judge, absent), refused to reinstate the cause.

Mr. Coxe, for plaintiff, moved for an attachment of contempt against the defendant, for having since the last term taken possession of the replevied goods.

But THE COURT refused; being of opinion that when the action of replevin was discontinued, the goods were no longer in the custody of the law.

[For subsequent proceedings in this case, see Case No. 9,672.]

## Case No. 9,672.

### MITCHELL v. WILSON.

[3 Cranch, C. C. 242.] [1]

Circuit Court, District of Columbia. Dec. Term, 1827.

DEED—GRANTING CLAUSE—HABENDUM—DEED OF SLAVE—POSSESSION—EVIDENCE OF TITLE—REPLEVIN—POSSESSION TAKEN BY DEFENDANT.

1. Whatever may be the words of grant in a deed, it is the office of the habendum, to limit and confine them, and to ascertain the commencement and duration of the estate created or conveyed by the deed.

2. A deed of bargain and sale was made, (and duly acknowledged and recorded,) by J. W. to his brother T. W., of a negro woman named Bet, and her increase, and a negro boy named Patrick, "from and after the date hereof," "with this reserve, that they are to remain with J. W. my father,—who is to hold and have the entire use and benefit of them during his life, and at his decease my said brother Thomas, his heirs, executors, administrators, or assigns, to take, hold and possess them ever after; to have, and to hold, the said negro woman Bet, and her increase, as aforesaid, and negro boy Patrick, (from and ever after the decease of my father, as aforesaid,) unto my said brother Thomas Wilson, his heirs, executors, administra-

[1] [Reported by Hon. William Cranch, Chief Judge.]

tors, and assigns, with general warranty from and after the decease of my father, as aforesaid." T. W. died in the lifetime of the father. Held, that neither T. W. nor the father took any thing by the deed.

3. The possession of a slave for twenty years, is prima facie evidence of a good title in a plaintiff in replevin, against everybody who does not show a better.

4. If a replevin be discontinued, the defendant is not guilty of a contempt, in taking possession of the goods, they being no longer in the custody of the law.

Replevin for a negro woman named Mahala. This cause, which was discontinued at December term, 1826, for want of the defendant's appearance, was by consent of the parties, at May term, 1827 [Case No. 9,671], reinstated, with a mutual release of errors, and it was agreed that upon a motion for the return of the property, the whole merits of the cause should be decided. The motion to return the property was accordingly made.

Mr. Coxe and Mr. Ashton, for plaintiff in replevin.

Mr. Key, for defendant.

CRANCH, Chief Judge (THRUSTON, Circuit Judge, absent). This is an action of replevin, brought on the 15th of May, 1826, by Thomas L. Mitchell, against William Wilson, administrator of Thomas Wilson, for a female slave, named Mahala, about twenty-one years of age. Mahala was the daughter of Bet. On the 20th of July, 1787, Joseph Wilson, son of Lancelot, made a bill of sale of his slave Bet, then about six years old, and three other slaves, to his son Joseph Wilson, Junior, and his heirs and assigns, in consideration of £105 paid by him to, or for his father. This bill of sale was recorded on the 7th of August, 1787, but was never acknowledged. Joseph Wilson, Junior, was then about twenty-seven years old, had a wife and family, and lived in the same house with his father, who delivered the slaves to him, and who was an intemperate man, and in embarrassed circumstances, and for whom his son had paid debts to the amount of £105. The slaves remained in the joint family of the father and son until the father and son moved into separate houses in the same neighborhood, when the slaves, excepting Bet, remained with the son, but were often in the service of the father. Bet lived with the father, and was an idiot, lame, and worthless. On the 31st of December, 1801, Joseph Wilson, Jr., made a bill of sale, under seal, in consideration of £25, to his brother, Thomas Wilson, of Bet, then said to be about twenty-three years of age, "and all her increase, from and after the date hereof, and her son, a negro boy named Patrick, about eighteen months old; with this reserve, that they are to remain with Joseph Wilson, my father, who is to hold and have the entire use and benefit of them during his life, and, at his decease, my said brother, Thomas Wilson, his heirs, executors, administrators, or as-